## Case No. 9,522.

### The MICHAEL GROH.

[1 Brown's Adm. 419.] [1]

District Court, E. D. Michigan. May, 1872.

TOWAGE—NEGLIGENCE—DAMAGES—EXPENSES OF GETTING OFF—PROTEST.

1. Where a vessel is aground amidships, and in danger of springing a leak, and wetting a valuable cargo, courts will not, as against the party by whose negligence she was grounded, scrutinize very closely the expense of getting her off, provided the master has acted in good faith.

2. The expense of a protest made before unloading, will be allowed, though it proves to be unnecessary.

On the libel of James Cooper and Robert Meginnity, owners of the schooner Columbian, for negligent towing and grounding of the schooner on a reef above Belle Isle, in Detroit river, June 9th, 1871. Libellants claimed damages for lightering, services of tugs and services of men in getting the schooner off, for damage to cargo, repairs, demurrage, etc., to the amount of $2,500. The answer admitted the towing and grounding of the schooner, but denied that the grounding was caused by negligence, or any fault on the part of the Michael Groh, or that the latter was liable for any part of the damages claimed.

W. A. Moore, for libellant.
H. B. Brown, for claimant.

LONGYEAR, District Judge. On the hearing, it was conceded that the Michael Groh was in fault, and that she is liable for all proper damages in consequence of the grounding of the schooner, including all necessary expenses in getting her off. The only contest there is relates to certain items of expenses and damages claimed by libellants. The items objected to, and the objections raised, will be taken up and considered in their order:

---

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

First. As to the services of the tug U. S. Grant, eleven hours, at $20 per hour, $220. The objections to this item are, first, that by an agreement between the master of the schooner, and the master of the Michael Groh, the latter was to get the schooner off at the expense of the Groh, and it is claimed that by virtue of this agreement, the master of the Groh had the right to select the means, and that the U. S. Grant was employed by the master of the schooner against the consent of the master of the Groh, and in violation of the tenor and effect of the said agreement; second, that the U. S. Grant was retained longer than was necessary, and after it clearly appeared that the vessel could not be got off by her; third, that it was poor judgment to attempt to pull her off without first lightering. Soon after the grounding of the schooner, there was some conversation between the two masters about getting the schooner off; but the evidence fails to satisfy me that it amounted to anything more than a recognition by the master of the Michael Groh of his liability for the grounding, saying at the same time that he would get her off. The future conduct of the two masters would seem to indicate that this was all there was of it, and that they in fact worked in concert, each doing all he could, according to his best judgment, to accomplish the result. About the only difference between them, so far as I can discover from the evidence, was in what appeared to be the controlling motive of each in what he did or refrained from doing. On the part of the master of the schooner it seemed to be expedition—to get his vessel off in the shortest possible time, regardless of expense. On the part of the master of the Michael Groh it seemed to be economy in the expenses—to get her off. but to do it with the least possible expense, even if it involved more or less delay.

The evidence shows that the schooner got aground about nine o'clock in the afternoon of June 10th, 1871. After the Michael Groh had pulled upon her for some time, and long enough to satisfy them that she could not pull the schooner off without aid, the two masters went to Detroit in quest of aid. Early the next morning they applied to the owner of the tug U. S. Grant, but the master of the Michael Groh objecting to his terms, they left in quest of cheaper aid. After spending an hour and a half or two hours in a vain search, the master of the schooner returned to the owner of the U. S. Grant and engaged her at twenty dollars per hour, and one hundred dollars for use of hawser. This was done without any further consultation with the master of the Michael Groh, and without his having withdrawn the objection made by him in the morning. This illustrates the controlling motives of the two masters as before suggested —the one being all for expedition, and the other all for economy. But let us see what justification there was for the master of the schooner to do as he did. His vessel was heavily laden with wheat. She was aground nearly amidships, both ends being clear of the bottom. She was in great danger of straining and springing a leak, and thus not only damaging her hull, but causing great damage to the cargo by wetting. Every hour's delay tended to precipitate these results. And in addition to these facts, the agent of the insurers of the cargo was urging expedition. It was under these circumstances that the master of the schooner engaged the services of the tug U. S. Grant as he did. I think he was fully justified in doing so. He had, in my opinion, been even liberal with the master of the Michael Groh in waiting for him as long as he did, and aiding him to find cheaper aid. He could hardly have been justified to his owners and the underwriters in waiting longer.

After the U. S. Grant had been employed and had commenced operations, the master of the Michael Groh succeeded in obtaining the gratuitous services of the United States revenue cutter Fessenden to aid in pulling the schooner off. The united forces of the Fessenden, the U. S. Grant and the Michael Groh, however, proved unavailing. It was then determined to lighten the schooner, and the U. S. Grant was retained to pull upon her from time to time while the lightening was going on, so as to diminish the necessity for lightening as much as possible. It was this retention of the Grant that constitutes the second objection to the allowance for the services, in part. I think her retention was for a proper and legitimate purpose, and that the objection is therefore untenable.

The third objection to the allowance for the services of the U. S. Grant is, that good judgment required that the schooner should have been first lightened before attempting to pull her off. The necessity of lightening was not so evident before an attempt to pull her off had been made as to make such attempt unjustifiable. It was, in fact, mere matter of speculation, whether she could or whether she could not be got off without lightening. If she could be got off without it, then it was the duty of those in charge to do so, and they could ascertain only by trying. But beyond all this, if there was any mistake of judgment here, it was a mutual mistake, and the respondents are estopped from claiming any advantage on account of it. The item for services of the tug U. S. Grant is allowed at the amount claimed by libellants, $220.

Third. As to the item for services of the schooner Nettie Howard, lightening, $480. The proof shows that the employment was by the hour, at $8 per hour. The objections are, first, that the rate per hour is extravagant; that a vessel could by reasonable diligence have been obtained for $3 per hour, which would have answered the purpose; second, that the proof fails to show a sufficient length of time to come to the amount charged, even at the rate paid. The first objection is not sustained by the proofs. There

was some proof that there was an open scow somewhere within reach, which might have been obtained at $3 per hour. In the first place there is no proof that the master of the schooner knew that fact. If it was his duty to ascertain it, it was equally the duty of the master of the Michael Groh not only to ascertain it, but to inform the other of it. It is true the master of the schooner seems to have employed the first vessel he could find; but, under the circumstances, respondents have no right to be very nice in their requirements of diligence on the part of the vessel in peril, in order to save a few dollars to the vessel by whose fault the peril accrued, when such diligence involved loss of time and consequent added peril to the vessel. And, in the second place, I do not think it would have been prudent to employ an open scow as a lighter, in view of the nature of the cargo.

The second objection to this item is sustained. The length of time the Nettie Howard was employed, as shown by the proofs, and as conceded in the argument, was 47½ hours, which, at $8 per hour, amounts to $380. The Nettie Howard was a Canadian vessel, and the difference in the two currencies was made up, being twelve per cent. at that time; this must therefore be added to the above amounts. making a total of $425 60, at which amount the item for services of the Nettie Howard for lightening is allowed, in lieu of $480, as claimed.

Sixth. As to the item for expenses of protest, $7 75. The objection to this item is that protest was unnecessary. On arriving at Buffalo, the destination of the schooner, the master, not knowing how badly the cargo might be injured, as a prudential step with reference to the insurance on the cargo, got out protest papers before unloading. Now, while protest was unnecessary to charge the Michael Groh, yet it was, to say the least, prudent under the circumstances, for the purpose above stated, and I think it ought to be allowed. The item for expenses of protest is, therefore, allowed at the amount actually paid, $7 75.

The remaining exceptions involved simply questions of fact. Exceptions overruled.